

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00169-CR
_____

ANTHONY WOODALL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th Judicial District Court
Bowie County, Texas
Trial Court No. 10F0133-005

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Anthony Woodall was sentenced to ten years' incarceration after his conviction by a jury of indecency with a child by contact.[1] Woodall appeals his conviction, claiming the trial court erred (1) in concluding that his pretrial statements were voluntary, (2) by denying Woodall the opportunity to present evidence of Nicole's subsequent abduction and sexual assault, and (3) by admitting letters purportedly written by Woodall over trial counsel's authentication objection. Finding no error, we affirm the judgment of the trial court.

## I.    Background

Seven-year-old Nicole Woods (pseudonym) and four-year-old Kimberly Moore[2] (pseudonym) spent the night with Woodall and his wife on Friday, October 2, 2009.[3] After attending church services that evening, the four traveled back to the Woodall home, and after eating supper and watching television, the children went to sleep on the couch. The following morning, Woodall returned the children to his sister's home.[4] The following Monday, Nicole told her mother that Woodall was "messing with" her when she spent the night at his home.[5] Nicole's mother contacted the police, at which time Woodall apologized for the incident, stating he was sorry and asking that she not make "a big deal" about it.

---

[1]See TEX. PENAL CODE ANN. § 21.11 (West 2011).

[2]The present appeal involves Woodall's conviction for indecency with Nicole. In a second appeal, also decided today in cause number 06-11-00170-CR, we address Woodall's conviction of two counts of indecency with a child by contact, and aggravated sexual assault of a child, both involving only Kimberly.

[3]Nicole's mother was dating Woodall's nephew at the time of the sleepover.

[4]Woodall's sister is Kimberly's grandmother.

[5]More specifically, Nicole stated that Woodall pulled her pants down and felt her private parts. Nicole's demeanor is completely different now than it was prior to the incident in October.

When Detective Brad Thacker of the Texarkana Police Department responded to the call from Nicole's mother, Woodall was present at the residence. Woodall voluntarily came in for an interview at the police department. He was not under arrest. Thacker testified that during the interview, Woodall stated that he was horse playing with the children and tickling them, and in doing so, his hands went down Kimberly's pants, and he could feel the contours of the child's vagina through her cotton panties. Woodall indicated that he became sexually aroused when this happened. Woodall further indicated that with respect to Nicole, his hand slid across her vagina through the outside of her clothing. When the children sat in his lap, Woodall became aroused.

While Thacker attempted to record the initial interview with Woodall, the recorder was not working properly and the interview was not recorded. Woodall was not in custody during this interview and was free to leave.

Because the initial interview was not recorded, Woodall was contacted by Detective Gisela Looney for a second, voluntary interview on October 7. Even though the second interview was noncustodial, Woodall was read his *Miranda*[6] rights. Woodall indicated that he could read and that he understood his rights. He then signed a waiver of those rights. During the second interview, Woodall initially stated that he accidentally touched the girls. As the interview progressed, however, Woodall admitted that he touched Kimberly under her pants and that he was aroused when touching both girls. Woodall admitted to touching both girls' vaginas and stated that if he became aroused when the children were in his lap, he would set them down.

---

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966). There was no claim in the trial court or on appeal that the second interview was a custodial interrogation.

Woodall stated that he touched Kimberly's vagina on three separate occasions. After the interview, Woodall was told that a time would be scheduled for Woodall to turn himself in.

## II. The Suppression Hearing

After his arrest and indictment, Woodall filed a motion to suppress both statements, alleging that he suffered "from a mental disease or disorder that prohibits him from fully understanding [his] rights and making an intelligent, knowing and voluntary waiver of [his] rights." At the hearing on the motion to suppress, the investigating officers testified that both interviews were voluntary and Woodall was not in custody during either interview, and that Woodall was read his rights, one by one, indicated that he understood them and initialed next to each right indicating he understood each right, and voluntarily waived them. Looney testified that she warned Woodall to ensure he understood his rights before she proceeded with the interview. Thacker testified that the interview lasted between forty-five minutes to an hour. The officers were not aware of any mental condition Woodall may have had.[7]

To rebut this testimony, Woodall called attorney Butch Dunbar, who represented Woodall in a Child Protective Services (CPS) case in which it was determined Woodall's mental or emotional illness or deficiency rendered him incapable of caring for his child. The trial court sustained the State's objection to the introduction of CPS documents outlining these findings, concluding that the documents were not relevant.[8]

---

[7]The record does not indicate the trial court listened to the video recording of Woodall's interview. The court indicated that it would listen to the recording if necessary.

[8]The trial court later concluded, during the suppression hearing, that because Woodall was not in custody during either interview, his Fifth Amendment rights never attached. Therefore, the issue of whether Woodall voluntarily and knowingly waived his rights was not an issue.

While the CPS documents were not admitted into evidence, Dunbar testified that he attended an interview between Woodall and a detective during a prior sexual assault investigation. Dunbar testified that even though Woodall denied the allegations prior to the interview, he appeared ready to admit the allegations after repeatedly being told to "just tell the truth" and "we can go home." At that point, Dunbar stopped the interview and asked Woodall why he appeared ready to admit the previously denied allegations. Woodall responded that if he admitted the allegations, he could go home, thus raising the inference that he did not understand that he would be arrested for making such admissions.

Upon further questioning regarding Woodall's ability to understand what he was doing, the trial court determined Dunbar was not qualified to present evidence on the issue of competency, at which time Woodall made a bill of exception as to Dunbar's remaining testimony.[9]

Thereafter, the trial court referred to various sections of Article 38 of the Texas Code of Criminal Procedure and determined Article 38.22 was not applicable to Woodall's interrogation because it was a noncustodial interrogation. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005).[10] The trial court then considered Article 38.21 on the issue of whether the statement was

---

The trial court further indicated that out of an abundance of caution, the court had Woodall evaluated for competency. The competency evaluation, conducted by Dr. Brian Smith, indicated that Woodall was competent to stand trial. While Smith's report is not in the record, Smith testified at trial that Woodall was competent to stand trial, but also determined Woodall suffered from mild mental retardation.

[9]This testimony included Dunbar's opinion that Woodall is susceptible to influence and eager to submit to authority. Woodall is easy to persuade and has a limited vocabulary. In an interview, he can be persuaded or tricked into saying almost anything. In Dunbar's opinion, Woodall has a diminished mental capacity.

[10]Section 3 of Article 38.22 provides, in part,

freely and voluntarily made without compulsion or persuasion[11] and concluded Dunbar's

opinions were

> not from a qualified witness on that issue. And, number two, it directly contradicts the opinion of Dr. Smith, who evaluated him for competency. And, number three, no issue of competency has ever even been raised in this case under Article 46B of the Code of Criminal Procedure.

The trial court concluded,

> I don't see anything that would indicate to me that the statements were not made freely and voluntarily and without compulsion or persuasion. So, you know, I find it to be a voluntary statement.

> The trial court then clarified its ruling:

> THE COURT: You're arguing that the statement was not voluntary based on his diminished capacity.

> [Defense Counsel]: Correct.

> THE COURT: Number one, you've not produced any witness that's qualified to give any opinions on mental capacity, first and foremost, so you haven't met your burden of proof to establish that. That's the basis for it.

---

Sec. 3. (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

(1)     an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2)     prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3.

[11]Article 38.21 provides,

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.

TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005).

But number two is, the doctor made a finding of competency, which includes the mental capacity issue. And so I'm saying, not only have you not met your burden of proof; in addition to that, there's also evidence which establishes positively that he is competent and that he does have the capacity.

I'm not saying that you've got to show he's incompetent to show that the statement is involuntary.

After jury selection, and on further review of this issue, the trial court reiterated the denial of the motion to suppress Woodall's statements for the reasons previously stated. The court indicated that in accord with *Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008), a defendant is entitled to maintain his statement is involuntary even when there is no constitutional violation under Section 6 of Article 38.22 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The trial court therefore concluded that even though Woodall's statements were not determined to be involuntary, the issue of voluntariness "becomes a fact issue for the jury to deal with at the appropriate time."

At the conclusion of the trial, the trial court filed a written order denying Woodall's motion to suppress evidence, together with findings of fact and conclusions of law. The order, while denying the motion to suppress, recognizes that the motion to suppress implicates issues of voluntariness under Article 38.22 of the Texas Code of Criminal Procedure. *Id.* Accordingly, the trial court entered findings of fact and conclusions of law, as required by the referenced statute.

The recorded confession was admitted into evidence at trial and played for the jury. Woodall then produced expert testimony of Dr. Thomas Tiefenwerth, intended to show that Woodall's confession was involuntary, because he displays the intellectual ability consistent with that of an individual with mild mental retardation. Tiefenwerth testified that Woodall's level of

7

intellectual ability would subject him to manipulation in an interview situation. In any type of circumstance that is not routine, Woodall would have difficulty understanding and weighing potential consequences. Woodall's statements, according to Tiefenwerth, were made in an attempt to appease police officers, based on his mild mental retardation, his respect for authority, and his desire to please those in authority. Later, the trial court instructed the jury not to consider Woodall's statements for any purpose unless the jury believed, beyond a reasonable doubt, that the statements were voluntarily made. The jury returned a verdict of guilty.

**The Trial Court Did Not Err in Finding Woodall's Statements to be Voluntary**

In his first point of error, Woodall contends the trial court erred by refusing to suppress his noncustodial statements given to police officers during the course of their investigation.

We apply a bifurcated standard of review to a trial court's denial of a motion to suppress, giving great deference to the trial court's determination of historical facts and reviewing de novo the trial court's application of the law. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact-findings are based on an evaluation of the credibility and demeanor of a witness. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). Mixed questions of law and fact that do not turn on the credibility and demeanor of a witness are reviewed de novo. *Id.*; *Woodruff v. State*, 330 S.W.3d 709, 731 (Tex. App.—Texarkana, pet. ref'd), *cert. denied*, 132 S.Ct. 502 (2011).

On appeal, this Court must give great deference "to the trial court's decision to admit or exclude [a defendant's pretrial statements], which will be overturned on appeal only where a

8

flagrant abuse of discretion is shown." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007); *Woodruff*, 330 S.W.3d at 732.

Woodall contends the trial court applied the wrong standard in its determination of whether his statements were voluntary. At the suppression hearing, the trial court determined that because Woodall's statements were made in a noncustodial setting, Article 38.22 "doesn't apply at all."

Article 38.22, sometimes called the Texas Confession Statute, "sets out rules governing the admissibility of an accused's written and oral statements that are the product of custodial interrogation." *Oursbourn*, 259 S.W.3d at 171. Woodall claims, however, that the voluntariness of his noncustodial statements should have been determined under Section 6 of Article 38.22, which provides:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be

9

entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling and order stating its findings.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6.

Even though the trial court ultimately concluded that its ruling "is the same for the same reasons with respect to the motion to suppress," the trial court recognized that *Oursbourn* requires that the voluntariness issue be submitted to the jury. *Oursbourn* also holds, however, that "Section 6 of Article 38.22 applies to *both* an accused's custodial and non-custodial statements because it provides that only 'voluntary' statements may be admitted." *Oursbourn*, 259 S.W.3d at 171.[12] While Article 38.22 generally protects suspects from police overreaching, "Section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period. Does it appear—as Article 38.21 requires—that the statement was freely and voluntarily made without compulsion or persuasion?"[13] *Id.* at 172. This was the precise issue the trial court was called on to decide.

Woodall contends the trial court failed to make its voluntariness determination by analyzing the totality of the circumstances and, therefore, its ruling was incorrect. *See Delao*, 235 S.W.3d at 239. We disagree. True, the determination of whether a confession is voluntary must be made by examining the totality of the circumstances. *Id.* at 241 (holding totality of

---

[12]Sections 2 and 3 of Article 38.22 apply to statements made while the accused is in custody and provide that such statements are admissible only if, prior to making the statement, the accused received the warnings provided in Article 15.17 or Article 38.22, Section 2(a) or Section 3(a) (incorporating the requirements of *Miranda*). These provisions do not apply here, as the trial court's determination that Woodall was not in custody when he provided the statements has never been contested.

[13]Article 38.21 provides: "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21.

10

circumstances standard for assessing voluntariness of confession appropriate standard to apply when confession made by someone suffering from mental retardation or mental illness).[14] Here, it is apparent, as explained below, that the trial court analyzed the issue of voluntariness under the totality of the circumstances and considered the issue of Woodall's mentality as one factor in that analysis.

Woodall apparently contends (although it is not crystal clear in his brief) that the trial court failed to make its voluntariness determination by examining the totality of the circumstances because it rejected a portion of Dunbar's testimony. Dunbar was the sole witness called by Woodall at the hearing on the motion to suppress. The trial court determined that Dunbar was not qualified to testify regarding the issue of competency. Woodall does not complain of this ruling on appeal.

While Woodall is critical of the trial court's exclusion of the CPS documents he sought to introduce through Dunbar's testimony, he does not directly complain of the exclusion of those

---

[14]In that case, Delao was asked to accompany two police officers to the station for questioning after he was identified as a suspect in a robbery. Delao was interviewed for approximately an hour. When Delao indicated that he was on medication, had difficulty reading, that he was a mental health/mental retardation (MH/MR) patient, and that he desired the attendance of his MH/MR counselor, the remainder of the interview was conducted in the presence of the counselor. *Delao*, 235 S.W.3d at 236–37. Delao commented at various times throughout the interview that he wished to terminate the questioning. Near the end of the interview, however, Delao confessed to the crime. *Id.* at 237.

Delao's motion to suppress the confession on the basis that it was involuntary was denied. On appeal, the court analyzed the totality of the circumstances to determine the voluntariness of the confession, including Delao's diminished mental capacity, the coerciveness of the interrogation, and Delao's right to terminate the interview at will. After considering these factors, the court of appeals determined that despite Delao's diminished mental capacity, the totality of the circumstances failed to demonstrate that his confession was involuntary. *Id.* at 238. In affirming this decision, the high court recognized that the totality of the circumstances standard is sufficiently all-encompassing to take into account such factors as are common to those suffering from a mental deficiency, such as a lower level of education, experience, self-sufficiency, and reasoning abilities than the average person. However, the mentality of the accused is simply one factor to consider when evaluating the voluntariness of a confession. *Id.* at 239.

11

documents on appeal.[15] Moreover, Woodall does not contend on appeal that Dunbar was qualified to provide testimony regarding Woodall's mental state.

Dunbar's admitted testimony revealed that he witnessed Woodall almost succumb to the pressure of authority when questioned in a similar setting on a previous date. This incident, claims Woodall, is strikingly similar to what is revealed on the video recording of his interview in this case.

Woodall further complains that the trial court failed to watch the recorded statement and compare it to Dunbar's testimony. He maintains the statement speaks for itself. Even though this was not a prolonged interrogation, Woodall claims the totality of the circumstances indicates that he made involuntary statements that ultimately resulted in his conviction for crimes in which the remaining evidence was questionable. The video showed that Woodall attempted to inform the officers that the touching was an accident, but the officers indicated that "we are not going to use the word accident." Woodall asked his interrogator if he was to "admit to something he did not do." Thereafter, however, Woodall made inculpatory statements.[16]

While it is apparent that some confusion existed at the suppression hearing regarding which section should apply to a noncustodial interrogation, the trial court correctly determined that the issue was whether the statements were freely and voluntarily made without compulsion

---

[15]Woodall apparently contends that because the CPS documents were excluded on the basis that the standard for competency and the standard for making a knowing and voluntary waiver of rights are the same, and because Smith previously determined Woodall was competent, the documents were not admissible and Woodall made a knowing and voluntary waiver of his rights. This argument is somewhat specious because (1) Woodall does not argue on appeal that the documents were improperly excluded, and (2) the trial court excluded the documents because it found them to be irrelevant. While the trial court did state that the ability to knowingly and intelligently exercise a waiver of rights is subsumed in a finding of competence, it later determined that Woodall's interrogation was noncustodial, and therefore waiver of rights was not an issue.

[16]The trial court watched the video-recorded interview with Woodall when it was played for the jury at trial.

or persuasion. *See* TEX. CODE CRIM. PROC. ANN. art. 38.21. The trial court heard testimony that Woodall voluntarily agreed to both interviews. Neither of the interviews were longer than an hour. Neither officer was aware that Woodall suffered from any type of mental condition. The trial court also heard testimony from Dunbar, as previously outlined.

The trial court's findings of fact[17] indicate that the trial court did, in fact, evaluate the totality of the circumstances surrounding Woodall's statements. These findings include the fact that Woodall voluntarily agreed to accompany Thacker to the Bi-State Justice Center to talk about the allegations against him; that Thacker did not handcuff Woodall or place him in the back seat of his vehicle behind the cage; that Woodall was not in custody when he gave his initial statement; that after giving his statement, Woodall was driven back to his residence by Thacker; that when Looney was assigned to the case the following day, she asked Woodall to come to the police station for another interview because the video system was not working during the first interview; that Woodall agreed to come to the police station for a second interview; that Woodall, along with his wife, drove to the police station to give the second interview; that Woodall was not arrested or placed in custody before he gave his second statement; that Woodall was not in custody when he gave his second statement; that upon completion of the second statement, Woodall left with his wife and returned home; that Woodall suffers from mild mental retardation; that prior to the hearing on Woodall's motion to suppress evidence, Dr. Smith, a board certified neuropsychologist, evaluated Woodall and found him

---

[17]The trial court's conclusions of law state:

    1. Defendant's statement to Det. Thacker was voluntary.

    2. Defendant's statement to Det. Looney was voluntary.

13

competent to stand trial; that Woodall is competent to stand trial; that Woodall did not present any competent evidence to establish that he lacked the capacity to voluntarily give a statement to the police; and that Woodall's statements to Thacker and Looney were voluntarily made.

Even though the trial court initially found that Article 38.22 was not applicable to the issue of whether Woodall's statements were voluntary, on further review, it determined that the important procedural protections of that article were invoked in this case: (1) the entry of an order stating its conclusion as to whether or not the statements were voluntarily made, along with the specific findings of fact upon which the conclusion was based, and (2) the submission of the issue of voluntariness to the jury, together with an instruction that unless the jury believes beyond a reasonable doubt that the statements were voluntarily made, the jury was neither to consider such statements for any purpose nor any evidence obtained as a result thereof. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The application of these protections, together with the trial court's consideration of the totality of the circumstances in determining whether the statements were voluntary, indicate compliance with this section of the Code.

Applying the appropriately deferential standard of review, we conclude that the record supports the trial court's finding that Woodall's statements were made voluntarily. We overrule this point of error.

## III. Evidentiary Issues at Trial

In his final two points of error, Woodall complains of trial court error in its refusal to admit evidence of Nicole's subsequent abduction and sexual assault and in the admission of letters purportedly written by Woodall over trial counsel's authentication objection.

14

**No Error in Refusal to Admit Evidence of Abduction and Sexual Assault**

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996); *Montgomery v. State*, 810 S.W.2d 372, 379–80 (Tex. Crim. App. 1990). We will not reverse a trial court whose ruling was within the "zone of reasonable disagreement." *Green*, 934 S.W.2d at 102; *Montgomery*, 810 S.W.2d at 391 (op. on reh'g). Moreover, the mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate an abuse of discretion. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005).

Nicole's mother testified at trial that when Nicole returned from Woodall's home, she was emotionally distraught and sad. She would not eat and was not acting as she normally did. This is not how Nicole acted prior to spending the night at the Woodall home. Since that time, Nicole's mother testified that Nicole wakes up with nightmares at least three times a week and that she is frightened of men. Her entire demeanor is completely different than it was before this incident. Nicole has changed schools three times since this incident. When Nicole's mother was asked if the nightmares are all attributed to the incident involving Woodall, she responded, "[S]he wasn't having nightmares before any of this happened." Nicole's mother testified that she attributed the nightmares to the incident involving Woodall.

When asked if Nicole suffered any other traumas or "any other incidents," the State interposed relevance and Rule 403 objections. Thereafter, in a hearing outside the presence of the jury, Nicole's mother testified that on December 19, 2009, Nicole was kidnapped and taken

to a Burger King where a man masturbated and ejaculated on her, then left her in the parking lot. Nicole's mother further testified that the nightmares began in October 2009.

The trial court ruled that the evidence of the subsequent sexual assault was inadmissible under Rules 403 and 412 of the Texas Rules of Evidence. TEX. R. EVID. 403, 412. Woodall initially contends that Rule 412 does not apply in this scenario. We agree.

Rule 412, commonly known as the Texas rape shield law, was designed "to restrict the introduction of evidence regarding the complainant's prior *consensual* sexual behavior to situations in which the evidence is both relevant to a defendant's defense and not unduly prejudicial or inflammatory." *Draheim v. State*, 916 S.W.2d 593, 599 (Tex. App.—San Antonio 1996, pet. ref'd). In that case, the defendant sought to introduce past sexual behavior of third parties to which the complainant could not have consented; Rule 412, therefore, did not apply. *Id.* Here, Woodall sought to introduce evidence of the subsequent sexual behavior of a third party to which Nicole could not have consented. Accordingly, Rule 412 does not apply. TEX. R. EVID. 412.

Next, Woodall contends the trial court erred in excluding the evidence of the subsequent kidnapping and sexual assault under Rule 403 of the Texas Rules of Evidence. TEX. R. EVID. 403.[18] After conducting a Rule 403 analysis, the trial court ruled that the subsequent incident was inadmissible because introduction of such evidence would tend to confuse or distract the

---

[18]Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

TEX. R. EVID. 403.

16

jury from the main issues, would have a tendency to be given undue weight by the jury, and could possibly suggest decision on an improper basis. Further, there was evidence that nightmares occurred after the Woodall incident and before the December kidnapping.

Woodall sought to introduce evidence of Nicole's kidnapping and subsequent sexual assault to show another potential cause for the nightmares other than the offense for which he stood trial. The trial court could have reasonably concluded that the inherent probative force of this evidence was considerable, since Woodall was accused of one incident of sexual indecency with Nicole. Moreover, Woodall correctly contends that Nicole's mother's testimony left the jury with the impression that all of Nicole's problems stemmed from the incident involving Woodall. Therefore, this evidence was relevant and probative to Nicole's mother's claim that Woodall was the sole cause of Nicole's trauma.

Conversely, the trial court reasonably concluded that the kidnapping and sexual assault could tend to confuse or distract the jury from the main issues in the case. In addition, it is reasonable to conclude that the December incident could have a tendency to be given undue weight by the jury. After balancing the various Rule 403 factors, the trial court's decision to exclude the December incident was within the "zone of reasonable disagreement." Therefore, we find no error and overrule this appellate point.[19]

**No Error in Admission of Woodall's Letters**

In his final appellate point, Woodall contends that the trial court erred by admitting letters Woodall purportedly wrote to the Bowie County Assistant District Attorney and to the Bowie

---

[19]We also acknowledge evidence that Nicole was distraught and sad after the Woodall incident, would not eat, did not exhibit her usual demeanor, and experienced nightmares. These problems existed prior to the December incident.

County District Attorney. Specifically, Woodall complains the letters were not properly authenticated under Rule 901 of the Texas Rules of Evidence. Tᴇx. R. Eᴠɪᴅ. 901(a). We find that the letters were properly admitted into evidence.

The first letter asks when Woodall is expected to return to court; the second letter requests a copy of Woodall's motion for discovery and a copy of his indictment.

The State sought to introduce the letters for the purpose of illustrating Woodall's mental capacity. The letters were initially discussed outside the presence of the jury, during a break in Dr. Smith's testimony. The State indicated that it planned to ask Smith about the letters to illustrate Woodall's mental capacity. The following discussion ensued:

[Defense Counsel]: May I look at them?

[The State]: Sure.

THE COURT: Yeah. Take a look at them and see if you've got any objection.

[The State]: It's not -- it's merely to show that he writes in complete sentences.

[Defense Counsel]: I'm kind of concerned this one makes it sound like he's in custody. It doesn't really say that. I'll let the judge have his discretion on that one.

THE COURT: Well, I think that -- well, the correctional center part -- excise that, Bowie County Correctional Center part.

[Defense Counsel]: Which is probably on the envelopes as well . . . .

. . . .

THE COURT: Yeah, detach the envelopes, excise that part.

[Defense Counsel]: And if a copy goes back to the jury, can we excise it and make a copy so they can't read through the --?

THE COURT: That's right.

[The State]: Yeah. Can we do, like show these to him now?

[Defense Counsel]: And then substitute them later.

THE COURT: Right.

Later, when the letters were shown to Smith, who was asked to read them to the jury, defense counsel objected on the basis that the letters were not authenticated. The trial court overruled the objection.

Initially, the State contends Woodall waived his authentication objection by failing to assert it when the letters were discussed with the trial court. Under Rule 901(a), "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). For instance, testimony of a witness with knowledge that a matter is what it is claimed to be can be sufficient to authenticate evidence. TEX. R. EVID. 901(b)(1). We find no waiver of Woodall's authentication objection. Presumably, the State could have elicited appropriate authentication testimony from Smith. When it became clear the State did not intend to authenticate the letters through Smith's testimony, defense counsel objected. To have raised an authentication objection during a conference outside the presence of the jury would have been premature.[20]

---

[20]The State further claims Woodall waived his authentication objection in failing to object to Looney's subsequent testimony to the effect that she witnessed Woodall sign the warning of rights form and that the writing on the two letters appeared to be from the same person who signed the warning form. One method of authentication consists of a nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of litigation. TEX. R. EVID. 901(b)(2). Because this testimony was proper to authenticate the letters in question, no objection was necessary. We find no waiver of this objection.

Woodall claims, however, that the letters were not properly authenticated when introduced. "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court [and] [w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) (citing TEX. R. EVID. 104(a), (b)).[21]

Under the doctrine of conditional relevance, a trial court may admit evidence lacking authentication on the condition that the offering party authenticate the evidence at a later time. *See* TEX. R. EVID. 104(b); *Heidelberg v. State*, 36 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2001, no pet.). If sufficient authentication does not take place by the close of the proponent's evidence, the opposing party must renew the original objection by a motion to strike the conditionally admitted evidence. *Heidelberg*, 36 S.W.3d at 673.

Prior to the close of the State's evidence, the State recalled Looney as a witness to authenticate the subject letters. The State showed Looney the warning form she discussed with Woodall during his interview. Looney testified that she watched Woodall initial and sign the warning form. Thereafter, Looney testified that the two letters purportedly from Woodall appeared to be the same handwriting as that on the warning form. Defense counsel did not cross-examine Looney with respect to the authentication issue. Given this testimony, a reasonable juror could conclude the letters were what the State purported them to be—letters written by

---

[21]Here, the trial court overruled the authentication objection, without specifically stating that the admission of the letters was subject to authentication. The letters were subsequently authenticated, however, by Looney. Further, the State represented to the trial court that "these are letters that [Woodall] sent to our office."

Woodall. The letters were properly authenticated, and the trial court's decision to admit them was not an abuse of discretion. We overrule this point of error.

## IV. Conclusion

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:     July 18, 2012
Date Decided:       July 31, 2012

Publish